Becker v. Ute Indian Tribe 22-4022 and arguing for the appellant is Ms. Bassett. You may proceed. Good morning, your honors. Good morning. Thank you. May it please the court. My name is Frances Bassett. I am here with my co-counsel, Thomasina Realburg, representing the Ute Tribal Appellants. I hope to reserve five minutes for rebuttal. Over the last six years, the Ute Tribal Parties have come before the Tenth Circuit four times in this case and a companion case. And on each of those four appeals, the Ute Tribe was the prevailing party. The tribe is here today on a fifth appeal because following the remand proceedings in this case, the district court sanctioned the Ute Tribe, the prevailing party, for nearly a third of a million dollars, more than $330,000. The court did so based upon the Ute Tribe exercising a right of arbitration it had under a 2009 settlement agreement with Mr. John Jurius. Now, Mr. Jurius did produce documents and testified in the Becker remand proceeding. He did so pursuant to subpoena, but he is not otherwise a party to the federal court cases. Because arbitration is a private proceeding and a matter of contract, until now no federal court has ever before recognized a theory or claims of abuse of arbitration or, quote, bad faith arbitration. But that is what the Ute Tribe has been sanctioned for. Wasn't the sanction linked to the court, the district court's claim that the arbitration was in bad faith and designed to intimidate a witness or a party in an ongoing federal court litigation? Isn't there a link to, under that interpretation? That is what the court said, Your Honor, Judge Tinkovich, but that is not what the evidence before the court showed. There was no evidence before the court and no finding by the court. The arbitration itself occurred, the arbitration itself was instituted three weeks after the conclusion of the evidentiary hearing. Well, wasn't it done in order to scare off the witness? I know, Your Honor, it was not. Can you move your microphone up a little bit? Yeah, we have a little bit of her hearing there. Can you hear me better? It was not, and there's no evidence. Sure looked like it. There's no evidence and no finding by the court that the arbitration action, which did not commence until after the evidentiary hearing was concluded, no evidence that it... Well, you were claiming that this man had breached an agreement, he had done all things that he shouldn't have done, and if he testified, it was going to be tough on him. And that's why the arbitration was initiated, and it ended up in his favor all the way across the board, didn't it? But there is no evidence before the court and no finding by the district court that the initiation of the arbitration action affected the production of documents pursuant to the And there's no evidence and no finding by the court that it affected, and no claim by Mr. Jurius, that it impacted his testimony to the court. So there was no interference with the judicial proceeding. And the U tribe had every right, it had a contractual right, and we contend a constitutional right of redress to arbitrate its claims against Mr. Jurius. Now, there were seven claims altogether. Five of those claims had nothing to do with the production of documents or Mr. Jurius's testimony in the Becker review. The two that did, I mean, as I understand the record here, the tribe and Mr. Becker, Mr. Jurius worked out an agreement or stipulation on the production of the subpoena documents and that you, you know, stipulated in the district court that the testimony could go forward, that documents could be used, and you reserved a right to object to certain of the documents as they came in. So, you know, if I'm sitting in the district court chair, I would assume that any problems with the settlement agreement had been resolved through this deal. And then three weeks later, you're dragging them into an arbitration panel for basically a breach of the settlement agreement that you had already represented to the district court was not going to be an obstacle to the, to the district court hearing. I mean, isn't that the, is that the timeline here? Oh, with all due respect, Judge Tinkovich, the, there was, I mean, we did have to essentially breach an agreement with Mr. Becker, but that was separate and apart from Mr. Jurius's obligations to the tribe, which was a meet and confer to keep confidential the tribe's records. And if he became subject to legal process for that, he doesn't dispute, he doesn't contend that he did do that. He admits he violated those provisions. So what this... Didn't documents come in at the hearing though? They did come in, and the tribe did not object to any of those documents. We did object. We did raise various objections. We did argue that they should be maintained confidential in the court proceeding. Those objections were overruled. But all of that goes to a question of waiver and not whether or not the, Mr. Jurius had breached his contractual obligation to the tribe. So the issue of waiver itself was a matter for the arbitrators to determine. The tribe also wanted to make sure because there had been a pattern of repeated violations by Mr. Jurius of his obligations to the tribe. So we wanted to ensure that this sort of thing would not happen in the future. As I said, five of the seven arbitration claims had nothing to do with the Becker remand hearing. The statute of limitations was running on some of those claims. So, I mean, the tribe had and does have an absolute right to arbitrate those claims. We emphasize in our briefs the broad language, the broad right of arbitration that is in that agreement. It does not limit and it's a right that's provided to both Mr. Jurius and the tribe. And it gives the parties the right not just to arbitrate claims like legal causes of action, but it says any controversy or claim arising out of or relating to this agreement or to the from our perspective had an absolute right to litigate that issue at what point. Is there a claim against Becker pending in or vice versa pending in the tribal court now? Yes. Is that where this case is? Yes. And will there be a trial in that proceeding presumably at some point? So, Your Honor, we're waiting at this point. We've had a couple of filing. We're waiting for Mr. Isom to be admitted to practice in the tribal court at this point. I assume that there could be a hearing in the tribal court. Is it foreseeable that Mr. Jurius would be a witness in that proceeding? Oh, I don't believe that the tribe would call him, Your Honor. Might the Becker? Perhaps. Yes. They could tell us. But this court itself, the Tenth Circuit in the, and I'm not sure I'm pronouncing it correctly, but the Xangular case, it's a Chinese name, X-Y-N-G-U-L-A-R case, that's from 2018, has said that a court's inherent authority to sanction a party for conduct occurring outside of the federal court, there must be a substantial interference with the judicial proceeding. And here there was no substantial interference. Again, there is no evidence, no finding of fact that, because the arbitration action occurred after the fact, that the arbitration affected to any extent Mr. Jurius's production of documents or his testimony. Were you saying that the district court did not have the authority to impose sanctions if he thought his authority was being threatened, deliberately threatened? No, it was not threatened. It certainly was threatened. I mean, come on. This man was subpoenaed and he had an obligation to show up. That didn't bother the tribe at all. They went ahead after him and the court said, make your objections. I'll rule on them. And it went forward from there, but that didn't stop the tribe, did it? It didn't stop the trial. But what are you going to do if you're subpoenaed? I'm sorry? What are you going to do if you are subject to a subpoena? Are you going to say I'm not going to testify? The tribe made no effort to prevent Mr. Jurius either from producing records or from testifying. No, they just went after him for equitable relief, punitive damages. Equitable relief? Well, the equitable relief would be to interpret those provisions of the contract and to ensure that there was not a future violation, to make sure that both Mr. Jurius and the tribe understood what those provisions required of both parties. I see I would like to reserve the remainder of my time. Thank you. You may. Mr. Parker, you're next. Good morning. Good morning. I may have policed the court. My name is Rodney Parker. I represent Mr. Jurius in this matter. I would like this morning to discuss the relationship between the litigation and the arbitration, what happened in those settings, because as a participant in both, I think my client and myself have more knowledge in that area, and then reserve the balance of the time for Mr. Isom, who will address how the tribe's actions impacted the litigation in which he and his client are involved. So I'm going to try to reserve six minutes for him. That's the reason I'm telling you that. I think the standard of review that's applicable here for most issues is abuse of discretion. The question of whether there was retaliation, whether there was bad faith, those are factual questions primarily, and I think they're entitled to deference, as is the nature of the sanction and the amount of the sanction. There are issues like due process and jurisdiction that are in the briefs that are obviously not. They're de novo review questions. The question that I would like to start with is whether the district court exceeded its jurisdiction by reaching into the arbitration and resolving claims within the arbitration, and the claim that the district court did that is simply not true, as I think from listening to your questions, I think you understand what that relationship was. The tribe had initiated arbitration, according to the district court, according to us, to retaliate against Mr. Jurius and to try to intimidate him from testifying in future proceedings. The fact that later this court reversed what was going on down there and sent it over to tribal court really has no bearing on what was happening at the time in the district court. At that time, the court felt that it would have further hearings there, and Mr. Jurius would need to testify and provide documents. I think that the idea that Mr. Jurius, that the tribe and Mr. Becker could reach this agreement that they reached, and that was put on the record and endorsed by the district court, the method of production of documents, which was to produce them attorney's eyes only, and then give the tribe time to object, and could then- Those documents were not provided to the tribe before the hearing, is that correct? I don't think that's exactly correct. They were provided to the tribe through that process. So they were given to Mr. Becker, and then I'm not sure if he gave them to the tribe or if Mr. Jurius did it directly. I wasn't involved at that point. But the tribe was given those documents somehow, and then had a period of time, which was 10 days or two weeks, to object. They did not object. Well, they objected. They said everything was attorney's eyes only confidential, and then the trial court had to resolve those objections during the testimony phase. When Mr. Jurius testified, his counsel made a statement to the court that Mr. Jurius was concerned about retaliation at that time. And it was quite, if you go to look at the transcript, it was quite an extensive explanation of what the concern was. And then the trial judge said to the tribe, if you have objections to what's happening here, or problems with confidentiality, this is the time to assert those objections. And there were a couple, I think there were five objections asserted, if I'm not mistaken. And then that was it. And then seven days, eight days later, the letter telling Mr. Jurius that they would commence arbitration, and two weeks after that, the arbitration commenced. And it was a lot of money, $2.5 million was also sought. The district court did, in its sanction order, reach into the two counts in the arbitration relating to the settlement agreement, and basically issued an order that said they were capital letters meritless, right? He said that for all of the claims. I mean, isn't that really reaching into an arbitration proceeding and making a decision about the merits of the arbitration that really is, you know, none of the court's business? Well, I don't think so, but I do acknowledge that I might not have used that word, meritless, and put it in capital letters like he did. But the court had to look at the viability or validity of the claims in arbitration, because that was the tribe's defense to the order to show cause. They said, we have colorable claims asserted in good faith. Then Judge Waddups had to look at those claims and make a determination, are they actual colorable claims, and are they asserted in good faith? And so that is the context in which he uses the meritless statement. But what then happened in the arbitration is, we went back to the arbitration panel and we did two things. We asked them to give due credit to Judge Waddups' findings that the arbitration was a retaliation, and we asked them not to compound the retaliation and instead to dismiss the arbitration to stop that retaliation. Then we moved for what was, I think we called it summary disposition in arbitration. It was summary judgment. We moved for summary judgment on all of the claims and asked the panel if they didn't just dismiss on the retaliation ground, then to go through the claims independently on the merits. We never took the position that the merits had been decided in arbitration, only that the fact of retaliation had been decided. And the panel went through- A couple of those claims in arbitration were totally unrelated to the district court proceeding or the settlement agreement, right? Representing his status with the tribe for business development purposes. Oh, I didn't quite hear what you said. They were not related, you said. That's true. That is true. There were claims. One was used the tribe as a reference. That was a clearly frivolous claim. He had not done that. He had referred to the tribe in his for the tribe in his resume. And then there was the going on to the reservation. I think in my brief I said Vernal, but the meeting was in Duchesne. My bad. In a public meeting in a public building, but within the exterior boundaries of the reservation. The panel found that to be a violation of public policy and Judge Waddups felt the same way. And then there was the doing business claim, which required an ownership of a certain percentage. In front of Judge Waddups, that was simply, there was simply no, the tribe could not come up with any evidence that Mr. Jurius actually owned the requisite interests or had done anything or that they had been harmed. And so that was what he- We're almost at the six minute mark. Do you want to go ahead and sum up? I'm sorry. I actually have a question for you before you sum up. So your opposing counsel says that there is no authority, no case law apparently, where a district court found bad faith arbitration in a collateral proceeding. Is that true? Do you agree with that? I don't know that I, I haven't seen a case that's similar to what happened here, where a retaliatory action was commenced, whether it was in arbitration or in some other setting. I haven't seen that, but I think pretty clearly the judge was concerned about- Well, I know what the judge was concerned with. I'm asking you, what is the basis of the judge's authority to do what he did? Inherent power. He has the inherent power to protect the integrity of the proceedings in his court, and that includes dealing with an issue where someone is obstructing justice or intimidating a witness or tampering with a witness. That's the area that we're in. The judge, I think, clearly has inherent authority to do that. Thank you. I've eaten into Mr. Isom's time. Thank you for your time. Good morning. May it please the court. My name is David Isom. I represent the appellee Lynn Becker. The overview of this appeal is as compelling as the details. The overview is that a party to a for testifying and producing documents pursuant to a federal subpoena. Let me answer some of the questions that were put here, and some of the misstatements that have been made by the tribe. And as you go through, I'd like to hear your best take on the evidence that supports that inference. The- That supports what? That supports the inference of bad faith intimidation. Okay. The evidence is this. The tribe says that the tribe made no effort to prevent jurists from producing documents or testifying. The record is clear. They sent him a letter that instructed him not to produce any records, and that told him that testifying and producing documents would be a violation of the settlement agreement. So here's the evidence. We subpoenaed jurists on remand. The reason is, though we had thought from the beginning that there would be no need for parole evidence, the rulings of this court on remand made it so that we needed somebody to talk about the year-long negotiation. We subpoenaed him. The tribe moved to quash, and we negotiated that. The tribe agreed that, and this was before any documents were produced, the tribe stipulated in writing, filed with the district court, that jurists would produce documents to me. I would hold them as confidential or AEO. I would give them to the tribe to object. The tribe didn't object to that, and so the documents came in. At the hearing, jurists' counsel stood up and said, the tribe has threatened that this might be a violation of the settlement agreement. He's here pursuant to subpoena. If there are any objections based on the settlement agreement or anything else, they should be made here. Judge Waddups ordered that. He said, if you have any objections, you should make them here. There were some objections made and overruled, but those were confidentiality based on AEO and things like that. There was not a single objection made that any of the evidence or the documents constituted a violation of the settlement agreement. A week later, jurists got notice that they were suing him for millions of dollars, and the nexus between litigation and the arbitration is not simply that it came right after. It is that the first two claims sought, piercing the corporate veil, millions of dollars of damages expressly for his participation pursuant to a subpoena. One was that he produced documents. They were claiming liability based on producing documents in response to a subpoena. The second claim was his testifying. So the nexus was they claimed that he had liability for testifying pursuant to a subpoena. The rest of the evidence is the rest of the course of what happened over the next six months. The tribe notified us that they were subpoenaing us in the arbitration. I wrote back to Ms. Bassett and said she wanted me to voluntarily accept service. I said, tell me why. Tell me what's going on here. And the subpoena itself was seeking documents relating to my communications with jurists and relating to the district court action. The subpoena she sent made it absolutely clear that whatever was going on in the arbitration was an outcrop and a result, a direct result, of Mr. Jurius' participation in the litigation. At five or six places along the way, the tribe had notice and the right to be heard. And the evidence, there was discussion here about the arbitration. The arbitration, it didn't matter whether the intimidation, by the way, they said there's no intimidation. It came later. First of all, it came before. And we're still in litigation. We've been in litigation 10 years. We're in the tribal court. Your time's up. And I had a question. Is it possible that Mr. Jurius will be a witness in the, if this thing ever goes to trial, either in the tribal court or federal district court? He's absolutely critical. Given the issues that have developed, he's absolutely critical to the court or any other court. We need him. And then one other timeline question. Prior to the district court hearing, documents are being supplied to you. Was the tribe given copies of those documents that were provided to you, all of them, before the district court hearing? By stipulation, I gave every document to them before Beckersaw or anybody else. I gave them all to them. They had 14 days to object. They didn't object. Okay. Thank you. Thank you. Ms. Bassett, you have a couple minutes for your rebuttal. Thanks. If I could, just a few matters here. I would like to begin by pointing out that it was possible for Jurius to both comply with the subpoenas and to satisfy his meet and confer obligations with the U-Tribe. That seems to be presented to the court as an either-or, but it was possible for him to have done both. Secondly, I would point out- Just my last question to Mr. Isons. So the tribe did see the documents that were in advance? We did, Your Honor. Yes. But there again, the concern was that he had not honored the meet and confer obligation. And I would say this, I mean- And what do you mean by that, the meet and confer obligation? Well, because the records, there seemed to have been a feeling, both on the part of the arbitrators and the district court, that the U-Tribe is just a public body. Therefore, all of its records are matters of public record. But tribes, especially a tribe such as the U-Tribe, organized under the Indian Reorganization Act, has two capacities. They are landowners and private business owners. So all of these materials related to the tribe's development of its oil and gas resources. They were confidential and proprietary. I know, but we're talking about a federal court hearing and the production of documents that are relevant to that proceeding. I mean, what was the meet and confer obligation that was breached? Because it would have given the tribe the opportunity to know in advance which documents were going to be produced. Alternatively, the sort of the subject areas of the plan testimony. Isn't that what happened through the stipulation? Not with Mr. Darius. We did end up breaching an agreement with Mr. Becker and the federal court, and that was a stipulation. But that did not- Why wouldn't that cover Darius' conduct? Because he had a contractual obligation to the tribe. I looked- But he also had a subpoena. Yes, I understand. We did not attempt to prevent him from complying with the subpoena. We did not seek damages based upon his compliance with the subpoenas. You know, there's been reference to the fact that we were seeking $2 million in damages. It turned out to be substantially less than that. At some point in the arbitration, we had to quantify what the damages were. We did not attribute any damages to the violation of the meet and confer. But the complaint asked for $2.5 million, correct? It was part of the arbitration that you had to, under a certain dollar level, meant that you got a single arbitrator versus three. So I think that that was how that was put in there. If this, the arbitration action was begun in January of 2020, at no time in his counterclaim or at any other point did Mr. Jurius contend that it was initiated in retaliation? I have one final question. What did the amended arbitration complaint accomplish? Do I have your permission? Yes, yes, please. Go ahead and answer. You know, an arbitration claim, sometimes they're just letters. So this was, it was done, you know, fairly summarily, I guess. We wanted to clarify that we were not seeking relief based upon Mr. Jurius' compliance with the subpoenas, but rather his failure to notify us and to meet and confer with us in advance. And so those were the changes. I would also add, if I could, that the Judge Waddups issued his chaucas order in August of 2020. The arbitration action was ongoing at that time. He could have ordered us, had he wanted to, to drop those claims. He did not. The tribe had retained independent sanctions counsel, and sanctions counsel believed that there was a good faith basis for going forward with the claims. But he could have, we could have dropped them at that time, had the federal court ordered it. It did not. All right, counsel, thank you. The time's expired. Counsel are excused and the case will be submitted.